CENDANT CORPORATION *v.* COMMISSIONER OF LABOR ET AL.
(SC 17183)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

18

Argued March 14—officially released October 25, 2005

*Aaron S. Bayer*, with whom were *Erika L. Amarante* and, on the brief, *William J. Anthony* and *Sarah C. Baskin*, for the appellant (plaintiff).

*Thomas P. Clifford III*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *William J. McCullough*, assistant attorney general, for the appellee (named defendant).

*Joseph D. Garrison*, with whom, on the brief, was *Lynda Rizzo*, for the appellee (defendant Kim Persky).

*Opinion*

VERTEFEUILLE, J. In this appeal, we are asked to determine the proper framework for analyzing a claim of interference with an employee's right to reinstatement under the Connecticut Family and Medical Leave Law, General Statutes § 31-51kk et seq. (leave statute). The plaintiff, Cendant Corporation, appeals from the trial court's judgment dismissing its appeal from a decision of the commissioner of labor (commissioner). The commissioner concluded that the plaintiff had violated the leave statute by failing to reinstate the defendant

Kim Persky[1] to her position with the plaintiff following a maternity leave. On appeal, the plaintiff claims that the trial court improperly affirmed the commissioner's decision because the commissioner employed an incorrect analytical framework in reaching his conclusion and because several of the factual findings made by the commissioner were not supported by substantial evidence. Specifically, the plaintiff claims on appeal that the trial court improperly affirmed the commissioner's decision because: (1) the commissioner incorrectly employed a strict liability standard in analyzing Persky's claim; (2) the commissioner improperly failed to allocate to Persky the burden of proving a causal connection between her leave and her loss of employment; (3) the evidence does not support the commissioner's conclusion that there was a causal connection between Persky's leave and her loss of employment; and (4) the evidence does not support the commissioner's conclusion that Persky would have retained her employment had she not taken leave. We disagree, and, accordingly, we affirm the judgment of the trial court.

The trial court relied on the following facts from the administrative record. The plaintiff is a corporation that provides global business and consumer services, and was created following the merger of two other corporate entities in 1997. Persky had been employed by one of the plaintiff's predecessors and continued to be a part of the management team with the plaintiff following the merger. In May, 1998, Persky was promoted to the position of vice president and general manager of the plaintiff's "Sidewalk" business unit, which was created as a result of a joint venture between the plaintiff and Microsoft Corporation (Microsoft). The plaintiff's role in the joint venture was to provide a sales force to

---

[1] The commissioner is also a defendant in this appeal. When discussing the defendants separately, we refer to the commissioner and Persky for ease of reference.

generate advertising revenue to support the Sidewalk website, which provided city-specific content related to entertainment, merchants, and other services. Persky oversaw the operations of the Sidewalk unit and managed the profits and losses of the unit.

The Sidewalk unit was changed to a vendor-vendee relationship by written agreement in June, 1998. In that agreement, the plaintiff granted Microsoft the option to purchase the Sidewalk sales force. The agreement provided that, if Microsoft exercised this option, the plaintiff would use reasonable efforts to ensure a successful transition of the unit to Microsoft. Peter Atkins, a general manager at Microsoft, was Persky's Microsoft counterpart on the Sidewalk project. Persky and two of her employees had difficulty working with Atkins due to his lack of cooperation in managing the Sidewalk project.

In November, 1998, Persky began reporting to Michael Wargotz, the president and chief executive officer of the plaintiff's lifestyles division, which included the Sidewalk unit. Persky immediately informed Wargotz of the difficulties of working on the Sidewalk project with Atkins. Persky also notified Wargotz that she would be requesting a maternity leave beginning in January, 1999. Jonathan Yee was thereafter selected to perform Persky's job while she was on leave. Persky and Yee worked together closely until Persky went on leave so that Yee could learn Persky's responsibilities with the Sidewalk unit. Persky began her leave on January 25, 1999. During her leave, Persky attempted to communicate with Wargotz through telephone calls and e-mail to remain current on developments with the Sidewalk unit, but Wargotz did not respond to her correspondence. Persky successfully had maintained contact with management during her previous maternity leaves, and she always had returned to the same or a better

position after those leaves. Persky expected to return to her position at Sidewalk following her leave.

In February, 1999, while Persky was on leave, Microsoft exercised its option to purchase the Sidewalk unit from the plaintiff. The plaintiff and Microsoft subsequently entered into a transition agreement, which voided the prior June, 1998 agreement, and set forth the terms of the sale of the Sidewalk unit to Microsoft. The transition agreement provided that the transition process would be completed by December, 1999. Wargotz informed Persky of the sale of the Sidewalk unit in March, 1999, and stated that he was no longer her manager. Following the reorganization of the plaintiff's management structure after the sale of Sidewalk, Persky was offered the opportunity to apply for several positions with the plaintiff, but no specific replacement position explicitly was offered to her. In July, 1999, a representative of the plaintiff informed Persky that it interpreted her failure to accept any of the other positions as indicating her voluntary resignation from the plaintiff.

In November, 1999, Persky filed a complaint with the state department of labor (department), alleging that the plaintiff had violated certain provisions of the leave statute by failing to reinstate her to her previous position following her maternity leave. Following a contested case hearing, the administrative hearing officer issued a proposed decision in September, 2002, concluding that the plaintiff had violated the leave statute and awarding damages to Persky. The plaintiff subsequently filed objections and exceptions to the hearing officer's decision, and the commissioner heard arguments concerning those objections and exceptions. The commissioner thereafter affirmed the hearing officer's decision, incorporating her findings of fact and conclusions of law into his final decision.

The plaintiff appealed from the commissioner's decision to the trial court. The trial court thereafter concluded that the commissioner properly had determined that the plaintiff had violated the leave statute and had used the correct analytical framework in deciding Persky's interference claim. The trial court further concluded that there was substantial evidence in the record to support the commissioner's conclusions that Persky's position continued to exist after her leave, that Yee held that position, and that the plaintiff had no legitimate business reason for failing to reinstate Persky. The trial court therefore dismissed the plaintiff's appeal.

The plaintiff appealed from the judgment of the trial court to the Appellate Court pursuant to General Statutes § 4-184, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. With this factual background in mind, we turn to the plaintiff's claims. Additional facts will be set forth as necessary.

I

Because we previously have not addressed the state and federal leave laws in detail, we begin with a brief overview of their history and framework. The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. (FMLA), is a federal statute that was enacted in response to "serious problems with the discretionary nature of family leave . . . ." *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U.S. 721, 732, 123 S. Ct. 1972, 155 L. Ed. 2d 953 (2003). Specifically, Congress was concerned that, "when the authority to grant leave and to arrange the length of that leave rests with individual supervisors, it leaves employees open to [discretionary and possibly unequal treatment]." (Internal quotation marks omitted.) Id. Accordingly, to avoid forcing employees to choose between their family responsibili-

ties and job security, and to help employees "balance the demands of the workplace with the needs of families," FMLA entitles eligible employees to a certain amount of unpaid leave to attend to family responsibilities. 29 U.S.C. § 2601 (b) (1).

The Connecticut leave statute is our state analogue to FMLA. Although this state originally had passed family leave legislation prior to the passage of FMLA, the legislature made a concerted effort to harmonize the state and federal leave provisions following the passage of FMLA in 1993. 39 H.R. Proc., Pt. 11, 1996 Sess., p. 3752. The legislature's initiative is reflected in an explicit statutory directive in the leave statute that ensures that its provisions will be interpreted to be consistent with FMLA. General Statutes § 31-51qq directs the commissioner to adopt regulations implementing the leave statute, and, in doing so, "[to] make reasonable efforts to ensure compatibility of state regulatory provisions with similar provisions of the federal [FMLA] and the regulations promulgated pursuant to said act." The statute's legislative history underscores the importance of harmonizing the state and federal leave provisions. During floor debate in the House of Representatives on the underlying bill, Representative Michael Lawlor noted that the bill would "merge the standards of both the federal and state family leave laws *so as to reduce confusion to employers and employees in Connecticut who are affected by either of these two laws.*" (Emphasis added.) 39 H.R. Proc., Pt. 11, 1996 Sess., pp. 3752–53. Accordingly, FMLA jurisprudence guides our interpretation of the provisions of the leave statute.

We turn now to an examination of the specific rights afforded to employees under these statutes. "FMLA creates two interrelated substantive rights for employees. . . . First, an employee has the right to take up to twelve weeks of leave [for, among other things, the birth or adoption of a child, or to care for an ill spouse,

parent, or child]. 29 U.S.C. § 2612 (a). Second, an employee who takes FMLA leave has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return from leave. 29 U.S.C. § 2614 (a)." (Citation omitted.) *Liu* v. *Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). This right to reinstatement, however, is not absolute. "FMLA does not entitle the employee to any rights, benefits, or positions [he or she] would not have been entitled to had [he or she] not taken leave. 29 U.S.C. § 2614 (a) (3) (B). It simply guarantees that an employee's taking leave will not result in a loss of job security or in other adverse employment actions." *Liu* v. *Amway Corp.*, supra, 1132. Accordingly, under FMLA, an employer may refuse to reinstate an employee following his or her return from leave if the employee would have been terminated for some other reason even if he or she had not taken leave. Our state leave statute contains identical provisions. See General Statutes § 31-55*ll*.[2]

FMLA provides two distinct causes of action for an employee whose rights have been violated under that act. First, an employee may claim that her employer interfered with her rights under the act. Section 2615 (a) (1) of chapter 29 of the United States Code provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." An employee may also claim that her employer discriminated against her or unlawfully discharged her in retaliation for exercising her rights under FMLA. 29 U.S.C. § 2615 (a) (2). The leave statute provides for the same

---

[2] Although the provisions of the leave statute and FMLA are virtually identical in all other respects, an eligible employee is entitled to up to sixteen weeks of leave under the leave statute as compared to the twelve weeks afforded to eligible employees under FMLA. See General Statutes § 31-51*ll* (a) (1). The leave statute also differs from FMLA in other respects not relevant to the present appeal.

two causes of action. General Statutes § 31-51pp (a) (1) and (2). When asserting a FMLA violation, an employee may pursue one or both of these causes of action.

In the present case, Persky claimed in her complaint that the plaintiff had interfered with her right to be reinstated to her original position following her leave. Accordingly, in this opinion, we address only the cause of action for interference and we examine the proper framework for analyzing a claim alleging interference with an employee's right to reinstatement. With this background in mind, we turn to the plaintiff's claims.

## II

The plaintiff's primary claim on appeal is that the trial court improperly affirmed the framework used by the commissioner in analyzing Persky's interference claim. Specifically, the plaintiff claims that the trial court improperly affirmed the commissioner's analysis because: (1) the commissioner improperly determined that the plaintiff was strictly liable for interfering with Persky's right to reinstatement; and (2) the commissioner improperly allocated the burden of proof in analyzing Persky's interference claim.

With respect to the strict liability standard, the plaintiff claims that holding an employer strictly liable for failing to reinstate an employee is inconsistent with the provisions in the leave statute that provide that the right to reinstatement is not absolute. The plaintiff further claims, with respect to the allocation of the burden of proof, that interference claims under the leave statute are akin to discrimination claims, and that, therefore, the burden-shifting framework set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), which places the ultimate burden of proof on the employee, is applicable to the claim in the present case. The defendants counter that the trial court correctly affirmed the commissioner's

determination that, once an employee has shown a right to reinstatement under the leave statute, an employer is strictly liable for interfering with an employee's exercise of her rights under that statute. The defendants further claim that relevant case law and regulations implementing the leave statute support the burden-shifting framework used by the commissioner and affirmed by the trial court, and that the *McDonnell Douglas Corp.* burden-shifting framework is inapplicable to interference claims. We agree with the defendants. Although the plaintiff briefed separately its two arguments concerning the proper analytical framework for interference claims, we note that both claims address related aspects of that framework, and we therefore examine them together.

We begin by noting that the parties disagree as to the appropriate standard of review with regard to the plaintiff's claims. The plaintiff contends that its claims concern the interpretation of previously unreviewed provisions of the leave statute and that we therefore should exercise de novo review. Specifically, the plaintiff claims that de novo review of its claims is warranted because the applicable burdens of proof in interference claims under the leave statute have not been reviewed by this court, and the available cases addressing the issue evince an inconclusive split of authority as to the appropriate burden allocation. The defendants counter that the plaintiff's claims on appeal do not involve questions of first impression, and that the trial court therefore correctly deferred to the commissioner's interpretation of the statute and regulations in question. We agree with the plaintiff. It is well established that "when [an] agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law." *South-*

*ern New England Telephone Co.* v. *Dept. of Public Utility Control*, 274 Conn. 119, 127, 874 A.2d 776 (2005). This court has not reviewed previously the question of the proper analytical framework to be used in analyzing a claim of interference with an employee's right to reinstatement under the leave statute. Accordingly, we review the plaintiff's claims de novo.

Because FMLA jurisprudence informs our interpretation of the leave statute in the absence of our own precedent, we turn to federal cases interpreting the relevant FMLA provisions for guidance. *Nussbaum* v. *Kimberly Timbers, Ltd.*, 271 Conn. 65, 73 n.6, 856 A.2d 364 (2003) ("[i]n construing a Connecticut statute that is similar to federal law, we are guided by federal case law"). Several federal Circuit Courts of Appeal have considered claims concerning an employer's interference with an employee's right to be reinstated to her position following leave. An examination of these decisions indicates that courts have employed one of two frameworks in analyzing such a claim. Most federal courts have used a framework wherein the ultimate burden of proof for overcoming liability for a FMLA violation is placed on the employer. One federal circuit, the Seventh Circuit; see *Rice* v. *Sunrise Express, Inc.*, 209 F.3d 1008 (7th Cir. 2000); has used the *McDonnell Douglas Corp.* burden-shifting framework, which places on the employee the ultimate burden of proving entitlement to the right to reinstatement.[3] We examine

[3] Ordinarily, "[t]he decisions of the Second Circuit Court of Appeals carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts." *Webster Bank* v. *Oakley*, 265 Conn. 539, 555 n.16, 830 A.2d 139 (2003), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 2d 244 (2004). In the present case, however, the Second Circuit Court of Appeals explicitly has sidestepped the issue of which of the two analytical frameworks apply to FMLA interference claims. See *Potenza* v. *New York*, 365 F.3d 165, 168 (2d Cir. 2004) (stating that, "because [the plaintiff's] case involves retaliation rather than interference, we need not decide whether or not to adopt the Seventh Circuit's analysis in its entirety"), citing *King* v. *Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir. 1999).

each approach in detail before undertaking our own analysis.

The majority of federal courts considering interference claims under FMLA have set forth a burden-shifting framework that requires the employee to make an initial showing that she has been denied a right under FMLA and that the denial of that right was caused in part by her leave. See, e.g., *Bachelder* v. *America West Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001) ("[i]n order to prevail on her [interference] claim . . . [the employee] need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her"); *Smith* v. *Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002) (To allege a claim of interference an employee must establish that "she was denied her substantive rights under the FMLA for a reason connected with her FMLA leave. . . . [A] reason for dismissal insufficiently related to FMLA leave will not support recovery under an interference theory."). Once an employee has made this showing, liability attaches to the employer for a violation of FMLA. Unlike the showing required in alleging a discrimination claim under FMLA, which, by definition, requires an employee to demonstrate a discriminatory intent on the part of her employer, an employee alleging a claim of interference under FMLA does not need to prove the employer's intent for liability to attach to the employer. *Smith* v. *Diffee Ford-Lincoln-Mercury, Inc.*, supra, 960 (In alleging a claim of interference with the right to reinstatement "the employee must demonstrate by a preponderance of the evidence only entitlement to the disputed leave. . . . [T]he intent of the employer is immaterial."). To underscore the immateriality of the employer's intent, some courts have described this attachment of liability to the employer absent a showing of intent as "strict liability." *Cross* v. *Southwest Recre-*

*ational Industries, Inc.*, 17 F. Sup. 2d 1362, 1368 (N.D. Ga. 1998) ("[Interference] claims . . . do not require that an employee prove that the employer acted with any particular intent—a mere showing that the employee was entitled to the benefit and the employer refused to provide it suffices to establish liability under the FMLA. The FMLA thus imposes strict liability upon employers who deny an FMLA entitlement to a qualified employee."). As we explain more fully later in this part of the opinion, the use of the term "strict liability" signifies only that an employee need not prove the employer's intent when claiming that the employer interfered with her rights under FMLA. Accordingly, with respect to interference claims alleging a denial of reinstatement, this strict liability scheme does not mandate that an employer be held liable for failing to reinstate an employee without consideration of the employer's reason for failing to reinstate the employee. An employer may overcome the attachment of so-called strict liability by demonstrating, by way of affirmative defense, that an employee would have been terminated even if she had not taken leave. *Throneberry* v. *McGehee Desha County Hospital*, 403 F.3d 972, 977 (8th Cir. 2005) ("an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights"); *O'Connor* v. *PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1354 (11th Cir. 2000) ("[w]e hold that when an 'eligible employee' who was on FMLA leave alleges her employer denied her FMLA right to reinstatement, the employer has an opportunity to demonstrate that it would have discharged the employee even had she not been on FMLA leave"). Accordingly, the framework used by the majority of federal courts holds an employer strictly liable for interfering with an employee's right to rein- statement, and places on the employer the ultimate

burden of proving that the employee would have been terminated even if she had not taken leave.

The Seventh Circuit Court of Appeals, however, has employed the *McDonnell Douglas Corp.* burden-shifting framework in analyzing interference claims, thus ultimately placing the burden of proving causation on the employee. In *McDonnell Douglas Corp.* v. *Green*, supra, 411 U.S. 802, the United States Supreme Court established a now well-known burden-shifting framework governing claims of employment discrimination. In adopting this framework to analyze claims of interference under FMLA, the Seventh Circuit Court of Appeals reasoned in *Rice* v. *Sunrise Express, Inc.*, supra, 209 F.3d 1018, that, because FMLA precludes an employee who takes leave from receiving "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave"; 29 U.S.C. § 2614 (a) (3) (B); an employee must always bear the ultimate burden of establishing that she is entitled to the benefit with which she claims her employer interfered. *Rice* v. *Sunrise Express, Inc.*, supra, 1018. Accordingly, under the *McDonnell Douglas Corp.* framework as adopted by the Seventh Circuit Court of Appeals, "[i]f the employer wishes to claim that the benefit would not have been available even if the employee had not taken leave, the employer must submit evidence to support that assertion. When that burden of going forward has been met . . . *the employee must ultimately convince the trier of fact, by a preponderance of the evidence, that, despite the alternate characterization offered by the employer . . . the benefit is one that the employee would have received if leave had not been taken.*" (Emphasis added.) Id. With these two approaches in mind, we turn to our analysis.

Like FMLA, the leave statute is silent as to the appropriate analytical framework to be employed in analyzing

an interference claim under the leave statute. As we previously have stated herein, however, our legislature has made clear its intention that Connecticut law conform to FMLA and federal regulations promulgated pursuant to the federal statute. We therefore endorse the framework employed by the majority of federal courts and conclude that the trial court properly affirmed the commissioner's application of the strict liability standard and his allocation of the burden of proof.

We are persuaded that the framework employed by the majority of federal courts should apply to the leave statute for several reasons. First, we find the strict liability framework adopted by the majority of federal courts to be consistent with the mandatory language used in the FMLA provision and the leave statute prohibiting interference with an employee's rights. Specifically, the FMLA provision in question provides that "[i]t *shall* be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." (Emphasis added.) 29 U.S.C. § 2615 (a) (1). Section 31-51pp (a) (1) of the leave statute similarly provides that "[i]t shall be a violation of sections 5-248a and 31-51kk to 31-51qq, inclusive, for any employer to interfere with, restrain or deny the exercise of, or the attempt to exercise, any right provided under said sections." This court previously has recognized the significance of the legislature's choice in electing to choose "shall" or "may" in formulating a statutory directive. "The words shall and may must . . . be assumed to have been used with discrimination and a full awareness of the difference in their ordinary meanings." (Internal quotation marks omitted.) *Builders Service Corp., Inc.* v. *Planning & Zoning Commission*, 208 Conn. 267, 304–305, 545 A.2d 530 (1988); *Fenton* v. *Connecticut Hospital Assn. Workers' Compensation Trust*, 58 Conn. App. 45, 53, 752 A.2d 65, cert. denied, 254 Conn. 911, 759 A.2d 504 (2000).

We therefore adopt the reasoning that "Congress used the words 'shall be unlawful for an employer to [deny an employee's rights under the FMLA]' rather than the words 'may be unlawful to [to deny an employee's rights under the FMLA],' [to indicate that it] intended to hold employers strictly liable for denying FMLA provided rights to employees." *Cross* v. *Southwest Recreational Industries, Inc.*, supra, 17 F. Sup. 2d 1368.

We note that the plaintiff mischaracterizes the scope of the term strict liability in challenging this standard on appeal. Specifically, the plaintiff claims that the trial court improperly affirmed the commissioner's use of a strict liability standard because such a standard implies that an employer must reinstate an employee following her leave, even if the employer had legitimate business reasons for not doing so. We disagree. The term "strict liability" has been used to distinguish the framework used for interference claims from the framework used for discrimination claims under FMLA. Specifically, in establishing an employer's liability for discrimination under FMLA, an employee must show a discriminatory intent on the part of the employer. By contrast, intent is irrelevant in establishing an employer's liability under an interference claim. It is in this sense only that an employer is strictly liable for interfering with an employee's FMLA rights. Contrary to the plaintiff's claim, none of the courts adopting the strict liability framework has interpreted this term to suggest that an employer is liable for failing to reinstate an employee even if the employer had legitimate business reasons for failing to do so. Indeed, FMLA and the leave statute both provide that an employee's right to reinstatement is not absolute. Specifically, § 2614 (a) (3) of FMLA provides in relevant part that "[n]othing in this section shall be construed to entitle any restored employee to . . . (B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee

would have been entitled had the employee not taken the leave." Similarly, General Statutes § 31-51nn (c) (2), a provision of the leave statute, uses identical language. Moreover, the Eighth Circuit Court of Appeals recently has rejected explicitly the claim that the term strict liability applies to interference claims in the sense understood by the plaintiff in the present case. *Throneberry* v. *McGehee Desha County Hospital*, supra, 403 F.3d 977 ("FMLA . . . *does not force* an employer to retain an employee on FMLA leave when the employer would not have retained the employee had the employee not been on FMLA leave" [emphasis added]). Accordingly, we reject the plaintiff's argument that the trial court improperly affirmed the commissioner's use of a strict liability standard.

We also find persuasive the burden-shifting analysis used by the majority of federal courts because this analysis is consistent with the regulations implementing FMLA and the leave statute. The federal regulations provide in relevant part that "[a]n employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment. . . ." 29 C.F.R. § 825.216 (a). In order to make such a showing, "*an employer would have the burden of proving* that an employee would have been laid off during the FMLA leave period, and, therefore, would not be entitled to restoration." (Emphasis added.) 29 C.F.R. § 825.216 (a) (1). The leave statute contains identical regulations. See Regs., Conn. State Agencies § 31-51qq-24 (a).[4] We agree with the reasoning of the Tenth Circuit

---

[4] Section 31-51qq-24 (a) of the Regulations of Connecticut State Agencies provides in relevant part: "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer shall be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment. . . .

"(1) . . . An employer would have the burden of proving that an employee

Court of Appeals that the federal regulation "validly shifts to the employer the burden of proving that an employee, laid off during FMLA leave, would have been dismissed regardless of the employee's request for, or taking of, FMLA leave." *Smith* v. *Diffee Ford-Lincoln-Mercury, Inc.*, supra, 298 F.3d 963. Several other federal courts also have been guided by 29 C.F.R. § 825.216 (a) in adopting the burden-shifting framework. See, e.g., *Throneberry* v. *McGehee Desha County Hospital*, supra, 403 F.3d 980; *Bachelder* v. *America West Airlines, Inc.*, supra, 259 F.3d 1125; *O'Connor* v. *PCA Family Health Plan, Inc.*, supra, 200 F.3d 1354; *Parker* v. *Hahneman University Hospital*, 234 F. Sup. 2d 478, 486 (D.N.J. 2002). We agree with these courts that a plain reading of 29 C.F.R. § 825.216 (a) clearly establishes the burden-shifting framework to be used in analyzing an interference claim, and we interpret our similar state regulation, § 31-51qq-24 (a) of the Regulations of Connecticut State Agencies, in the same manner. We therefore reject the plaintiff's claim that the regulation only explains the nature of the substantive right to reinstatement without establishing a definitive burden-shifting framework.

We also reject the plaintiff's argument that the *McDonnell Douglas Corp.* burden-shifting framework should apply to the interference claim in the present case for several reasons. First, we note that, in view of the weight of authority adopting an alternate burden-shifting framework, we find unpersuasive the plaintiff's sole reliance on the reasoning of the Seventh Circuit Court of Appeals in *Rice* v. *Sunrise Express, Inc.*, supra, 209 F.3d 1018, to support its contention that the *McDonnell Douglas Corp.* framework should apply to interference claims. Moreover, logic dictates that the *McDonnell Douglas Corp.* framework, which "is

would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration. . . ."

intended to provide guidance to fact finders who are faced with the difficult task of determining *intent* in complicated *discrimination* cases"; (emphasis added) *Craine* v. *Trinity College*, 259 Conn. 625, 637, 791 A.2d 518 (2002); is inapplicable in analyzing a class of claims, such as interference claims, for which intent is not a consideration. The Ninth and Tenth Circuit Courts of Appeal explicitly have rejected the use of the *McDonnell Douglas Corp.* framework for interference claims on precisely this basis. See, e.g., *Liu* v. *Amway Corp.*, supra, 347 F.3d 1136; *Smith* v. *Diffee Ford-Lincoln-Mercury, Inc.*, supra, 298 F.3d 963; *Bachelder* v. *America West Airlines, Inc.*, supra, 259 F.3d 1125. Because we already have concluded that the FMLA regulation established the correct burden-shifting framework, and because the *McDonnell Douglas Corp.* framework was created explicitly to address claims where proof of an employer's intent is required, we reject the use of the *McDonnell Douglas Corp.* framework for analyzing interference claims under the leave statute.

For all of the foregoing reasons, we conclude that the trial court properly affirmed the analytical framework used by the commissioner in analyzing an interference claim under the leave statute. In the present case, the trial court affirmed the commissioner's use of the strict liability standard, which does not require that the employee alleging a claim of interference prove the employer's intent. In deferring to the commissioner's legal conclusions, the trial court also implicitly affirmed the commissioner's choice to use the burden-shifting framework that placed the ultimate burden of proof on the plaintiff to show that Persky would not have been employed at the time she sought reinstatement. Accordingly, we conclude that the trial court properly affirmed the analytical framework employed by the commissioner.

### III

The plaintiff also challenges the trial court's affirmance of several of the commissioner's factual findings. Specifically, the plaintiff claims that, regardless of the allocation of the burden of proof, the trial court improperly concluded that there was substantial evidence in the record to support the commissioner's findings that: (1) there was a causal connection between Persky's termination and her leave; and (2) Persky would have retained her position had she not taken leave. The defendants counter that the trial court properly determined that there was substantial evidence in the record to support the commissioner's findings. We agree with the defendants.

As a preliminary matter, we state the applicable standard of review. In reviewing the commissioner's factual findings and conclusions, "[the court must] determine whether there is substantial evidence in the administrative record to support [these] findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact." (Internal quotation marks omitted.) *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, 265 Conn. 413, 417, 828 A.2d 609 (2003). With these standards in mind, we examine the plaintiff's claims. Because the question of whether Persky's termination was connected to her leave is inextricably linked to the question of whether she would have retained her position had she not taken leave, we examine these claims together.

The plaintiff first claims that, regardless of where the burden of proof lies, the trial court improperly concluded that there was substantial evidence in the record to support the commissioner's findings that there was

a causal connection between Persky's termination and her leave. The plaintiff further claims that the trial court improperly determined that there was substantial evidence in the record to support the commissioner's finding that Persky would have remained employed with the plaintiff had she not taken leave. The plaintiff claims that the factual findings in the record compel a conclusion that the plaintiff had legitimate business reasons for failing to reinstate Persky and that she would have been terminated if she had not taken leave. Specifically, the plaintiff contends that the trial court failed to appreciate the significance of the evidence in the record indicating that Persky's position had been eliminated due to corporate restructuring in connection with the sale of the Sidewalk unit, and that Persky's inability to work with Atkins, her Microsoft counterpart, would have resulted in the loss of her position if she had not taken leave. We disagree.

The trial court cited the following evidence in support of its determination that there was substantial evidence in the administrative record to support the commissioner's conclusion that Persky's termination was causally connected to her leave. In her proposed decision, which was incorporated into the commissioner's final decision, the hearing officer stated: "The record reveals no evidence that the [plaintiff] intended to permanently replace [Persky] with Yee before she started her leave. Yee was regarded as a 'placeholder' when [Persky] went on leave. [Persky] was active in planning for the sale of [S]idewalk to Microsoft up until she started her leave. Only after she commenced her leave did Wargotz start to ignore [Persky's] attempts to keep current on the progress of the transition agreement. During her previous maternity leaves, the [plaintiff] had kept [Persky] up to date on what was transpiring in her departments. Up until her leave in 1999, [Persky] had been complimented on her willingness to take on the difficult role

of watchdog or 'bad cop,' and she had been forthright and constructive in her dealings with Microsoft." The trial court also noted, in its memorandum of decision: "Shortly before Persky went on leave she received a very positive review and a 7.9 [percent] raise. . . . In addition, both [Vere Spandow, vice president of operations of the Sidewalk unit] and Yee testified that Persky was professional, and neither of them indicated having problems working with her. . . . No one informed [Persky] that she would not be returning to her position as vice president and general manager of Sidewalk when her leave ended. . . . As in *Smith* v. *Diffee Ford-Lincoln-Mercury, Inc.*, supra, [298 F.3d 961] the timing of Persky's discharge also indicates a causal relation between her . . . leave and her dismissal." (Citations omitted.)

The trial court further pointed to the following evidence and testimony to support its conclusion that there was substantial evidence in the administrative record for the commissioner to have found that Persky would have remained in her position had she not taken leave. "Yee, as Persky's temporary replacement, admitted that [Persky's position] continued to exist after the transition agreement was executed in February, 1999, and that many of the position's pretransition duties continued during the transition. . . . Yee retained Persky's title . . . and performed substantially similar duties to those that she had performed working with Spandow and Microsoft. . . . Spandow, who was one of Persky's [vice president level] subordinates, confirmed this fact as well. . . . Additionally, the controlling agreement between [the plaintiff] and Microsoft for the provision of transition services . . . provided evidence of the availability of Persky's position. . . . Finally, Spandow's testimony showed that he believed that both his and Persky's positions continued to exist after the tran-

sition and sale of Sidewalk was announced in February, 1999 . . . ." (Citations omitted.)

We conclude that, on the basis of the evidence regarding Persky's prior leave history, the favorable reviews of her work performance, her cooperative and professional manner, and the continued availability of her position following her leave, the trial court properly determined that there was substantial evidence in the record to support the commissioner's findings that there was a causal connection between Persky's leave and the subsequent denial of her reinstatement, and that Persky would have retained her position had she not taken leave. We therefore reject the plaintiff's argument that the trial court improperly applied the substantial evidence test because it failed to recognize that the evidence in the record regarding Persky's inability to work with Atkins directly contradicted the commissioner's findings. Although the trial court had before it Atkins' testimony about an acrimonious relationship with Persky, it also had before it the commissioner's determination that he did not find Atkins' testimony regarding Persky's professionalism and attitude to be credible, and that he therefore accorded more weight to Yee and Spandow's testimony in this regard.[5] Accordingly, the trial court in the present case properly determined that the commissioner's findings concerning the continued existence of Persky's position were supported by substantial record evidence in the form of

---

[5] Although the hearing officer noted Atkins' testimony in numbered paragraphs under the heading "Findings of Fact," it is clear to us from the discussion and analysis sections of the hearing officer's decision, later adopted by the commissioner in his final decision, that the hearing officer did not find Atkins' testimony credible. We therefore construe the statements under the facts section only as a summary of Atkins' testimony, and not as acceptance of his testimony as credible.

persuasive testimony from Yee and Spandow.[6] We therefore conclude that the trial court properly affirmed the commissioner's conclusion that the plaintiff had failed to show that Persky would have been terminated even if she had not taken leave.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[6] We do not address the merits of the plaintiff's remaining claims. Specifically, the plaintiff claims that the trial court improperly affirmed the commissioner's conclusion because: (1) the commissioner improperly determined that the plaintiff had violated the leave statute by failing to offer Persky an equivalent position when her original position was unavailable; and (2) the commissioner placed Persky in a better position than she would have been had she not taken leave. Because we already have concluded that the trial court properly affirmed the commissioner's conclusion that Persky's original position continued to exist during her leave and following the denial of her reinstatement, we do not reach these claims.